# In the
# United States Court of Appeals
## For the Seventh Circuit

————————

No. 02-3201

GERALD P. LAMPLEY,

*Plaintiff-Appellee,*

*v.*

ONYX ACCEPTANCE CORP.,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 3901—**William J. Hibbler**, *Judge.*

————————

ARGUED MAY 27, 2003—DECIDED AUGUST 18, 2003

————————

Before ROVNER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Gerald Lampley believed that he had been denied a promotion by Onyx Acceptance Corp. as a result of race discrimination. He complained to the Equal Employment Opportunity Commission (EEOC) and shortly thereafter was fired. Lampley then filed a Title VII suit against Onyx and a jury concluded that he was a victim of race discrimination, awarding him $1,000 in compensatory damages. The jury also awarded compensatory and punitive damages totaling $345,000 for retaliatory discharge, although this amount was later reduced by

$45,000 to comply with a statutory cap. Onyx appeals the retaliatory discharge award, arguing that the award is excessive and that the punitive damages issue should not have gone to the jury. Because we find that a jury could reasonably have determined that punitive damages were warranted and that a total award of $345,000 was not inappropriate, we affirm.

## I. BACKGROUND

Gerald Lampley, an African-American, was employed as an account manager with Level 1 buying authority[1] by Onyx Acceptance Corp., a California-based company engaged in "indirect automobile finance." Lampley worked out of Onyx's Rosemont, Illinois branch office under Mike Strater, the "dealer center manager" for that office. (Strater was an assistant manager when Lampley was first hired in February 1998; he was promoted to manager in October 1998.) Beginning in the fall of 1999, Lampley repeatedly asked Strater to give him Level 2 buying authority,[2] but his requests were denied. Lampley ultimately determined that race discrimination was the reason for Strater's failure to promote him.

For resolution of discrimination issues, Onyx's policy was to have employees call the Human Resources Department at corporate headquarters in California. There was a notice in Lampley's office stating that employees should report suspected discrimination to the EEOC. Upon determining that he was a victim of race discrimination, Lampley did not call headquarters, but instead talked to Michelle Bland about a comment Lampley found to be racially offensive

---

[1] A manager with Level 1 authority could approve loans up to $15,000 without counter-approval.

[2] A manager with Level 2 authority could approve loans up to $20,000 without counter-approval.

that he believed Strater had made.[3] According to Lampley, Bland advised him to work things out with Strater. Lampley next went to the EEOC to file a race discrimination claim on November 26, 1999. Strater called Lampley at that time, and Lampley explained that he was at the EEOC filing a complaint.[4]

Strater scheduled a meeting with Lampley for November 29, 1999. According to Lampley, at the meeting (which was also attended by Joseph Long, one of Strater's assistant managers) Strater told Lampley that "[w]e can't have anybody working here who complains and files complaints to the EEOC. I want your resignation." Lampley refused, and Strater fired him. Lampley then returned to the EEOC and filed a retaliatory discharge claim. During the EEOC investigations of both the race discrimination and retaliatory discharge claims, Onyx told the EEOC that Strater's failure to promote Lampley and Lampley's ultimate termination were due to Lampley's inadequate performance, and provided supporting documentation. The EEOC dismissed Lampley's charges and issued him right-to-sue letters.

In April 2002, after settling his claims against Strater, Lampley pursued a two-count complaint against Onyx, claiming race discrimination and retaliatory discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* At trial, he provided data that countered the documentation Onyx had sent the EEOC to support its claim that Lampley had performance problems. For in-

---

[3] When Lampley was first hired, Bland was the dealer center manager in Chicago. Bland was a regional vice-president at the time of trial.

[4] Strater acknowledged that the EEOC was mentioned during the conversation; he testified that Lampley's exact words were "I'm at EEOC checking out my options." Strater also admitted that he was aware of federal anti-discrimination laws.

stance, Onyx told the EEOC that Lampley obtained $295,767 and $367,550 in loans in September and October 1999, respectively. However, Lampley's documents showed that he had obtained $395,767 in loans in September and $767,550 in October. The target loan amount for these months was $400,000. Lampley, whose wife was pregnant at the time of his termination, explained that he felt "devastated" upon being fired, and is "definitely changed from it." His wife also testified regarding Lampley's altered emotional state following his termination, describing him as "depressed." She also said that although Lampley did not seek psychiatric help, the couple eventually received counseling through church services.

Strater and Long both asserted that at Lampley's termination meeting, there was no discussion of or reference to the EEOC, and that a meeting had in fact been scheduled for the previous Friday for the purpose of terminating Lampley. Strater further stated that he, Long, and Kurt Wheeler, an assistant manager, had decided to fire Lampley on November 22, 1999, and had called Rosie Hokanson, a vice-president and human resources director, on that date to inform her of their decision.

Bland and Hokanson said that Onyx had an anti-discrimination policy, but no physical evidence of this policy was provided to the jury.[5] Hokanson was responsible for providing documentation to the EEOC during the EEOC investigations, including the documents suggesting that Lampley was not performing satisfactorily. When cross-examined about a statement she had sent to the EEOC stating that Lampley "was given a formal written warning via telephone on November 24, 1999 by his immediate supervisor, Kurt Wheeler, regarding his performance issues," Hokanson said

---

[5] Lampley did recall that during orientation at Onyx, he was told to contact headquarters should any problems arise.

she verified the existence of the written warning by pulling Lampley's personnel file. However, when she was asked to review Lampley's personnel file and find the written warning, Hokanson acknowledged that it was not there.

The jury ultimately awarded Lampley $1,000 in compensatory damages and no punitive damages on his race discrimination claim. With respect to the retaliatory discharge claim, the jury awarded $75,000 in compensatory damages and $270,000 in punitive damages. The district court denied Onyx's motions for judgment notwithstanding the verdict, a new trial, and remittitur below the statutory maximum. However, at the request of both parties, the district court reduced the judgment from $345,000 to $300,000 in order to satisfy the $300,000 statutory cap for a company of Onyx's size. *See* 42 U.S.C. § 1981a(b)(3). The court did not explain whether the compensatory damages award, the punitive damages award, or both were being diminished. Onyx appeals both the compensatory damages award and punitive damages award resulting from the retaliatory discharge claim, asserting that the punitive damages issue should never have gone to the jury, and that the $300,000 award is excessive even if it is within the statutory cap.

## II.  ANALYSIS

### A.  Sufficiency of the Evidence Regarding Punitive Damages

Onyx asserts that there was insufficient evidence to warrant the imposition of punitive damages. The question of whether Onyx is entitled to judgment as a matter of law on this issue is subject to de novo review, with the evidence and all reasonable inferences taken in the light most favorable to Lampley. *Mathur v. Bd. of Trs. of S. Ill. Univ.*, 207 F.3d 938, 941 (7th Cir. 2000). More specifically, we

ask "whether no rational jury could have found for the plaintiff." *Id.* (internal quotation marks omitted).

A plaintiff may recover punitive damages under Title VII if three requirements are satisfied.[6] Specifically, the plaintiff must establish that the employer "acted with knowledge that its actions may have violated federal law" and that "the employees who discriminated against him are managerial agents acting withing the scope of their employment*.*" *Bruso v. United Airlines*, 239 F.3d 848, 857-58 (7th Cir. 2001) (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535, 543 (1999)). However, even if these two prongs are met (and Onyx concedes that a jury could find that they are in this case), "the employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy." *Id.* (citing *Kolstad*, 527 U.S. at 545). Onyx claims that it has engaged in good faith efforts, and thus the district court's decision to let the jury assess punitive damages was in error.

We are unpersuaded by Onyx's argument. Onyx allegedly had a formal anti-discrimination policy, although it is difficult to ascertain the contours of this policy without physical evidence of its existence. But even assuming that the policy included appropriate procedures, we explained in *Bruso* that "although the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance, it

---

[6] As explained in 42 U.S.C. § 1981a(b)(1), such recovery is allowed "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."

is not sufficient in and of itself to insulate an employer from a punitive damages award." *Id.* at 858. Here, there was sufficient evidence for a jury to believe that Onyx failed to engage in good faith efforts at Title VII compliance after it became aware of Lampley's retaliatory discharge claim.

Specifically, Lampley provided statistics prepared by Wheeler that showed that Lampley was meeting (and at times greatly exceeding) company expectations. This data flatly contradicts the statistics that Strater and Hokanson presented to the EEOC to establish that Lampley was a poor performer and that this was the cause of his termination. The jury could have reasonably believed that the numbers Onyx provided (which Hokanson claimed were verified before she sent them to the EEOC) were doctored solely to discredit Lampley. Additionally, when Hokanson failed to produce evidence of the written reprimand that she insisted she had seen in Lampley's personnel file, the jury could have reasonably believed that no such reprimand existed. It could have instead determined that the reprimand was merely a trumped-up charge designed to mislead the EEOC into believing that Onyx had planned to terminate Lampley long before he complained to the agency. Indeed, the jury specifically found that Onyx had no plans to terminate Lampley prior to the filing of his initial EEOC complaint.[7] In *Bruso*, we found that evidence of a sham investigation designed to discredit the plaintiff was sufficient to defeat the defendant's motion for judgment as a matter of law with respect to a punitive damages claim. *Id.* at 861. Here, we have a similar situation. Because a jury could have found that Onyx engaged in a cover-up rather than a good faith investigation of Lampley's retaliatory discharge claim, we

---

[7] In light of this finding, it is puzzling that Onyx continues to insist that corporate headquarters was notified that Lampley would be fired for poor performance long before he went to the EEOC.

find that the punitive damages issue was properly before the jury.[8]

## B.  The Damages Award

Onyx further contends that both the compensatory and punitive damages that the jury awarded for retaliatory discharge are excessive, and the district court therefore erred in refusing to grant Onyx a new trial on damages or to set damages below the $300,000 statutory maximum. This court reviews a district court's denial of a motion for remittitur or a new trial on damages for an abuse of discretion. *See Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 755 (7th Cir. 2002) (citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433 (2001)) (explaining that punitive damages awards are reviewed for an abuse of discretion if no constitutional violation is alleged); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285, 1287 (7th Cir. 1995).

### 1.  Compensatory Damages

When assessing the propriety of a compensatory damages award, relevant inquiries may include "whether the award is monstrously excessive," "whether there is no rational connection between the award and the evidence," and "whether the award is roughly comparable to awards made in similar cases." *AIC Sec. Investigations*, 55 F.3d at 1285 (internal

---

[8] Onyx complains that by going to the EEOC instead of first contacting the Human Resources Department, Lampley deprived Onyx of the opportunity to engage in good faith efforts to remedy the race discrimination problem. This may well be the case. However, the jury presumably addressed this point when it declined to award punitive damage for Lampley's race discrimination claim, and the retaliatory discharge claim is entirely separate.

quotation marks omitted). We find that the award in this case is by no means monstrously excessive, whether analyzed at $75,000 as reflected in the jury's verdict or at $30,000 based on the assumption that the district court's $45,000 reduction applied solely to the compensatory damage award. There was a rational connection between the award and the evidence presented. Although Lampley found a new job two months after his termination, both he and his wife provided detailed testimony explaining the termination's negative effects on Lampley's emotional state, some of which linger today. The jury was also told that Lampley sought church counseling one year after his termination. Moreover, Lampley testified that because his wife was pregnant at the time of his termination, he was especially stressed about the ability to deal with costs associated with child-rearing in light of his unemployment. Based on this evidence, a jury reasonably could have believed that $75,000 was necessary to fully compensate Lampley for his pain and suffering.

Onyx points to cases in which the plaintiff received less than $75,000 in compensatory damages to show that Lampley's award is out of line. However, these cases are easily distinguishable. For instance, in *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227-29 (7th Cir. 1995), we diminished an award from $21,000 to $10,500 because the degree of emotional distress was not proven; only 14 lines of testimony addressed emotional distress. By contrast, in the instant case, there were numerous pages of testimony regarding emotional distress. In *Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576 (7th Cir. 1996), the plaintiff's $25,000 award was remitted by approximately $6,000. However, the plaintiff's retaliatory discharge in *Merriweather* was only one of several factors, such as her father's death, affecting the plaintiff's emotional state. *Id.* at 581. Here, Onyx has not shown that

Lampley's emotional distress was the result of anything but the termination.[9]

While it is true that plaintiffs in *Peeler v. Village of Kingston Mines*, 862 F.2d 135 (7th Cir. 1988) and *AIC Security Investigations* received only $50,000 in 1988 and 1995 respectively despite suffering severe emotional and financial hardship, these numbers do not account for inflation,[10] and more recent cases reveal that the compensatory damage award in the instant case is not an outlier. For example, in *Tullis v. Townley Engineering & Manufacturing Co.*, 243 F.3d 1058 (7th Cir. 2001), this court upheld an $80,000 compensatory damages award to a victim of retaliatory discharge. The jury awarded that amount based solely on the plaintiff's testimony that he felt "low," "degraded," and "back-stabbed," and experienced financial difficulties with respect to his utility bills, child support, and clothing and entertainment purchases for his children. *Id.* at 1067-68. Moreover, in light of its rational connection to the evidence, we would consider Lampley's award to be within the bounds of reasonableness even without relying on the comparison to *Tullis*. A court should not substitute a jury's damages verdict with its own figure merely because

---

[9] Onyx alleges that Lampley was already experiencing feelings of depression and loss of confidence before his termination because he realized that he was not going to be able to tell his family that he had been promoted. However, the jury ostensibly addressed the emotional distress caused by the discrimination when it awarded $1,000 in compensatory damages for Lampley's discrimination claim. Onyx has presented nothing to suggest that the jury confused cause and effect with respect to the emotional distress resulting from his *retaliation* claim.

[10] For instance, as this court explained in *Tullis v. Townley Engineering & Manufacturing Co.*, 243 F.3d 1058, 1069 (7th Cir. 2001), the *Peeler* plaintiff's $50,000 award in 1988 was worth approximately $70,000 in 1999 according to a Statistical Abstract.

a case with similar facts has not yet arisen, or because a plaintiff in a similar case was perhaps not able to plead his facts to the jury as well. Awards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive. Due to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive. We therefore conclude that the district court did not abuse its discretion in denying a new trial or remittitur with respect to the compensatory damages award.

### 2.  Punitive Damages

Onyx also contends that the punitive damages award, whether analyzed as $270,000 or $225,000 (the latter figure assumes that the district court's $45,000 reduction applies solely to the punitive damages award), "exceeds what is necessary to serve the objectives of deterrence and punishment," and should therefore be set aside. *AIC Sec. Investigations*, 55 F.3d at 1287. Specifically, Onyx complains that it did not promote the belief that it was appropriate to violate federal law, and was not even aware of Lampley's contact with the EEOC until after he had been fired; thus, the punitive damages award is not an appropriate assessment of Onyx's blameworthiness. *See EEOC v. Indiana Bell Telephone Co.*, 256 F.3d 516, 527 (7th Cir. 2001) (en banc).

Onyx's argument ignores the fact that based on the record, a jury could well have believed that after upper-level management officials such as Hokanson learned of Lampley's retaliatory discharge claim through the EEOC, they determined that Lampley had in fact been illegally terminated but chose to discredit him rather than admit to the facts surrounding his termination. Furthermore, the jury could reasonably have found that an award smaller than $270,000 would not have curbed such behavior. In *AIC*

*Security Investigations*, this court stated that "evidence did show that AIC had gross yearly revenues of several million dollars. We think it reasonable to suppose that a sizeable award [in that case, $150,000 in punitive damages][11] is both suitable and necessary to punish and deter a corporation of this size." 55 F.3d at 1287. At trial, Strater testified that his office, one of twenty Onyx offices in existence at the time of trial, acquired loans with a face value of between $100,000,000 to $150,000,000 annually. Thus, the jury did not act unreasonably in this instance when it determined that a $270,000 award was necessary to ensure that Onyx sat up and took notice.[12]

Onyx cites *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1355 (7th Cir. 1995) for the proposition that the statutory maximum, or something close to it, can only be awarded in the most egregious cases. But as we just explained, the evidence clearly supported a finding that Onyx engaged in a cover-up in flagrant violation of Title VII, thus warranting a large punitive damages award. Additionally,

---

[11] The punitive damages award was in addition to a $50,000 compensatory damages award, bringing the total award to the statutory maximum of $200,000 for a company of AIC's size.

[12] Onyx also relies on *EEOC v. Indiana Bell Telephone Co.*, 256 F.3d 516 (7th Cir. 2001) (en banc), in which the defendant employer allowed a male employee to engage in numerous acts of gross sexual misconduct before taking appropriate action against the offending employee. According to Onyx, Indiana Bell's behavior was far more egregious than Onyx's own actions, but the three plaintiffs in *Indiana Bell* received a total of $635,000 in punitive damages (following the district court's remittitur of a $1,050,000 jury verdict), less than the $270,000 the jury awarded Lampley. We fail to see how *Indiana Bell*, a sexual harassment case centered around an employer's inaction, is even remotely similar to the case at issue, in which the jury could have found that Onyx took affirmative steps to cover up its misdeeds.

we stated in *Fine v. Ryan International Airlines*, 305 F.3d 746 (7th Cir. 2002) that because Title VII cases are so fact-specific, "we will not normally disturb an award of damages in a Title VII case at or under the statutory cap, as this decision is largely within the province of the jury." *Id.* at 755 (internal quotation marks omitted); *see also Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1028 (9th Cir. 2000) ("Reflecting our general deference to jury verdicts, we have never required the district court to adjust a jury's punitive damages verdict so that it is proportional, in the court's view, to the defendant's wickedness. Such proportional adjustments are left to the jury itself."). In sum, Onyx has not provided a compelling reason for disturbing the award in this instance. We therefore find that the district court did not abuse its discretion in denying remittitur or a new trial with respect to the punitive damages award.

## III.  CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*